UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                                             :
MILTON BIALOSTOK,                                            :          05 Civ. 2698 (RJH)
                                                             :
                              Petitioner,                    :
                                                             :
              -against-                                      :          **MEMORANDUM
                                                             :          OPINION AND ORDER**
                                                             :
CRAIG APKER,                                                 :
                              Respondent.                    :
                                                             :
-------------------------------------------------------------x
```

Federal prisoner Milton Bialostok ("Petitioner"), an inmate in the custody of the

Federal Bureau of Prisons ("BOP") at the Federal Correctional Institute in Otisville, New

York ("FCI Otisville"), seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and a

writ of mandamus pursuant to 28 U.S.C. § 1361, requesting the Court to order Craig

Apker,[1] the warden of FCI Otisville, to reconsider petitioner's community corrections

center ("CCC") placement date. According to petitioner, the policy under which his CCC

placement date was actually calculated (the "2005 Policy") is unlawful for a number of

reasons, including because (i) it is based on an erroneous interpretation of 18 U.S.C. §§

3621(b) and 3624(c); (ii) it was not enacted in accordance with Administrative Procedure

Act ("APA") guidelines; and (iii) as applied to him, it violates his Due Process rights and

the *Ex Post Facto* Clause of the Constitution. Accordingly, petitioner asks that his

---

[1] Although petitioner originally brought this claim against Fredrick Menifee in his capacity as the warden at
the Federal Correction Institution in Otisville, Craig Apker, as Menifee's successor as warden, is
automatically substituted as respondent in this action pursuant to Federal Rule of Civil Procedure 25(d).

placement date be reconsidered pursuant to the designation policy in effect prior to December 2002.

Respondent opposes the petition on a number of bases, including because (i) petitioner lacks standing to challenge the 2005 Policy; (ii) petitioner's challenge is moot; (iii) the 2005 Policy is otherwise valid; and (iv) application of the 2005 Policy to petitioner does not violate the *Ex Post Facto* Clause.

For the reasons set forth below, the Court denies the petition.

## BACKGROUND

### A.    The BOP's CCC Placement Policies

This petition calls into question the manner in which the BOP has chosen to exercise the discretion afforded it by 18 U.S.C. §§ 3621(b) and 3624(c), which together allow the BOP to assign and transfer inmates to and among prison facilities, including facilities designed to help outgoing inmates re-transition into society, such as CCCs.

Section 3621(b), which governs facility transfers, provides in pertinent part:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate *any* available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau . . . *that the Bureau determines to be appropriate and suitable*, considering —
>
> > (1) the resources of the facility contemplated;
> >
> > (2) the nature and circumstances of the offense;
> >
> > (2) the history and characteristics of the prisoner;
> >
> > (4) any statement by the court that imposed the sentence—
> >
> > > (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

> > (B) recommending a type of penal or correctional facility as appropriate; and
>
> > . . . The Bureau may at *any time*, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another.

18 U.S.C. § 3621(b).

Section 3624(c), which requires the BOP to prepare outgoing prisoners for "re-entry" into the community, provides in relevant part:

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. . . .

18 U.S.C. § 3624(c). Although neither section has been amended in several years, the BOP has employed three different policies in the last three years when setting a prisoner's CCC placement date. These policy-shifts have been detailed on several occasions by courts considering similar challenges, *see, e.g., Moss v. Apker*, 05 Civ. 2676 (VM), 2005 WL 1593016, at \*1 (S.D.N.Y. July 6, 2005) (collecting cases); *Wiesel v Menifee*, 04 Civ. 9681 (DAB), 2005 WL 1036297, at \*1-\*4 (S.D.N.Y. May 2, 2005); *Levine v. Menifee*, 05 Civ. 1902 (RCC), 2005 WL 1384021, at \*1-\*3 (S.D.N.Y. June 9, 2005); accordingly, this Court will only briefly describe the genesis of the 2005 Policy before addressing its merits, beginning with the policy as it stood before December 2002.

Prior to December 2002, the BOP interpreted Sections 3621(b) and 3624(c) such that inmates were typically transferred to CCCs approximately six months prior to their release date, even if this six-month period was greater than "the last 10 per centum of the [their prison] term". (the "Pre-December 2002 Policy"). 18 U.S.C. §3624(c). In

December 2002, following a declaration of the Department of Justice's Office of Legal

Counsel ("OLC"), the BOP revised its policy to allow inmate transfer to a CCC for only

the last ten percent of their prison terms, not to exceed six months (the "December 2002

Policy").

The impact of this change depended on how long a term the prisoner was serving.

For inmates serving terms shorter than sixty months, it could be significant. For

example, prior to December 2002, an inmate serving a forty month sentence could be

expected to be placed in a CCC six months before his release date, regardless of the fact

that ten percent of his sentence was only four months. By contrast, under the December

2002 Policy, that same inmate would not be placed in a CCC until four months before his

release date, effectively shortening his CCC placement by two months.[2] In the

institutional context, where the quality of prison life is presumably much lower than the

quality of life in a CCC, it is not surprising that many inmates considered the change to

be the equivalent of an additional two month prison sentence.

For this very reason, a number of the inmates affected by the policy change – *i.e.*,

those sentenced to terms of less than sixty months – brought habeas petitions challenging

the December 2002 Policy. When presented with these challenges, the majority of the

courts in this district, including this Court, found the December 2002 policy to be

unlawful for any one of – or some combination of – three reasons. *See, e.g. Zucker v.*

*Menifee,* 03 Civ. 10077 (RJH), 2004 WL 102779, at *11 (S.D.N.Y. Jan. 21, 2004)

(holding that the December 2002 Policy was based on an erroneous interpretation of

---

[2] For inmates serving terms longer than sixty months, the outcome was the same under the Pre-December 2002 Policy and the December 2002 Policy because these inmates' ten percent dates met or exceeded the six-month maximum mandated by 18 U.S.C. § 3624(c), and incorporated into the new rule.

4

Sections 3621(b) and 3624(c)); *Cato v. Menifee,* 03 Civ. 5795 (DC), 2003 WL 22725524, at *5 n. 1 (S.D.N.Y. Nov. 20, 2003) (policy violated the APA notice and comment requirement); *Crowley v. Federal Bureau of Prisons,* 312 F.Supp.2d 453, 462-63 (S.D.N.Y. 2004) (policy violated *Ex Post Facto* Clause).

In response to these and other similar rulings, the BOP proposed, and ultimately adopted, a new set of CCC placement rules pursuant to the APA's notice and comment procedures.   These new rules are codified at 28 C.F.R. §§ 570.20, 570.21, and became effective on February 14, 2005.[3]  Although this new "2005 Policy" is in some respects distinguishable from its predecessor, the end result is substantively identical from the inmates' point of view.  Indeed, under the 2005 Policy, the BOP has simply "explicitly recogniz[ed] its discretion under § 3621(b) to designate federal inmates to CCC's . . . [and has chosen] 'to exercise its discretion categorically to limit inmates' community confinement to the last ten percent of the prison sentence being served, not to exceed six months'", *Wiesel*, at *3 (citing 69 Fed. Reg. 51213 (Aug. 18, 2004)), thus effectively maintaining its policy of limiting CCC placements to the final ten percent of inmates'

---

[3] 28 C.F.R. § 570.20 provides, in pertinent part:

    (a)  This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for designating inmates to community confinement only as part of pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community. . . .

28 C.F.R. § 570.21 provides, in pertinent part:

    (a)  The bureau will designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.

    (b)   We may exceed these time frames only when specific Bureau programs allow greater periods of community confinement as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. § 3621(e)(2)(A)), or shock incarceration program (18 U.S.C. § 4046(c)).

sentences. In other words, the 2005 Policy is essential an updated version of the December 2002 Policy. The question before the Court, then, is whether this new version fixes the problems that plagued the old one.

Before addressing that question, and in order to provide some context, the Court will briefly outline the status and procedural history of petitioner's incarceration.

### B.     Procedural History

On March 30, 2004, petitioner was convicted in the United States District Court for the Southern District of New York of one count of conspiracy to commit money laundering, and was sentenced to a period of 24 months imprisonment (and 24 months of supervised release).[4] Petitioner began serving his 24-month prison term at FCI Otisville on June 1, 2004, and has a projected release date of February 24, 2006, assuming he receives full credit for good conduct. If petitioner receives no good conduct credit, his term of imprisonment will expire on May 29, 2006.

On March 25, 2005, the warden at FCI Otisville signed a form "BP-210", or "Institutional Referral for CCC Placement", pursuant to which petitioner's CCC placement date was set for December 27, 2004, which is approximately two months before his February 24, 2006 projected release date. (*See* May 24, 2005 Declaration of Les Owen, ¶¶ 8-9, Ex. E ("Owen Decl.")).[5] Petitioner is thus among the class of prisoners affected by the BOP's decision to limit CCC placements to the last ten percent of the prisoner's sentence – indeed, if his placement date had been calculated pursuant to

---

[4] In addition, petitioner was required to forfeit $750,000.

[5] Petitioner disagrees with this, contending instead that his CCC placement date was set at some point before February 14, 2005, the effective date the 2005 Policy. Absent evidence to support this position, and on the strength of the Declaration of Les Owen, as well as Respondent's other submissions, all of which indicate that any earlier CCC placement date was a "working" date, and therefore without force, the Court finds that petitioner's CCC placement date was set on March 25, 2004, pursuant to the 2005 Policy.

the pre-December 2002 Policy, he likely would have been eligible for placement on or about August 24, 2005, a full four months earlier.

For this reason, on February 10, 2005, Petitioner brought the present petition challenging his CCC placement date, asking the Court to order that it be recalculated pursuant to the Pre-December 2002 Policy. Although the petition challenges the date as if it had been set pursuant to the December 2002 Policy, the Court finds that petitioner's CCC placement date was set on March 25, 2005, under the 2005 Policy. So petitioner's attack on the December 2002 Policy is moot. However, in his *Motion to Request Summary Judgment* ("Pet. Mot. for SJ"), petitioner indicates that he is *also* challenging the 2005 Policy. Regardless, respondent contends that the petition must be dismissed because it erroneously focuses on the December 2002 Policy, which is not at issue in petitioner's case. Addressing that issue first, the Court now turns to the merits of the petition.

## DISCUSSION

### A.     Standing and Mootness

As noted, respondent first argues that the petition should be dismissed because it wrongly focuses on the December 2002 Policy. It is respondent's position – and a correct one, insofar as it goes – that petitioner has not suffered any injury as a result of the December 2002 Policy, which means that he lacks standing to bring claims based on its implementation. As a second, related ground for dismissal, respondent notes that because the December 2002 Policy has been superseded by the 2005 Policy, petitioner's challenge is moot. (*See* Memorandum of Law in Opp. to Pet., pp. 5-7 ("Opp. Memo.")).

In his *Motion to Request Summary Judgment*, petitioner, a *pro se* prisoner, has requested that this Court construe his petition liberally, explaining that he received a "formidable" memorandum of law from respondent, and is "ill equipped" to address the issues contained therein. (Pet. Mot. for SJ, p. 5). For precisely this reason, it is well established that courts should construe *pro se* pleadings liberally, and should read their submissions to raise the strongest arguments they suggest. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994). On this basis, the Court will construe petitioner's submissions as a request for leave to amend his Petition to include a challenge to the 2005 Policy. *See* Fed.R.Civ.P. 15(a); *Wiesel*, at *4; *Levine*, at *3. The Court grants this request, primarily because the amendment will work no prejudice on the respondent, who, anticipating this outcome, prospectively addressed the issue of whether the 2005 Policy is valid. The Court now turns to that question.[6]

## B.    The 2005 Policy

Petitioner is not the first to challenge the 2005 Policy. To the contrary, it has been the subject of several opinions issued in this circuit, the majority of which have upheld it. *Yip v. Federal Bureau of Prisons,* 363 F.Supp.2d 548, 551-52 (E.D.N.Y. Apr. 1, 2005) (upholding 2005 Policy); *Wiesel v. Menifee,* No. 04 Civ. 9681 (DAB), 2005 WL 1036297 (S.D.N.Y. May 2, 2005) (same); *Levine v. Apker,* 05 Civ. 3472 (CLB), 2005 WL 1417134 (S.D.N.Y. May 20, 2005) (same); *Levine v. Menifee*, 05 Civ. 1902 (RCC), 2005 WL 1384021 (S.D.N.Y. June 9, 2005) (same); *Troy v. Apker*, 05 Civ. 1306 (GEL), 2005 WL 1661101 (S.D.N.Y. June 30, 2005) (same); *Moss v. Apker*, 05 Civ. 2676 (VM), 2005

---

[6] The Court will not address Petitioner's challenge under the APA because the February 2005 Policy, unlike the December 2002 Policy, was clearly promulgated in accordance with the notice-and-comment procedures of the APA, as every court to consider the question has found. *See Levine*, at*4 (collecting cases).

WL 1593016 (S.D.N.Y. July 6, 2005) (same); *Gentzler v. U.S.*, 05 Civ. 4521 (LTS), 2005

WL 1773684 (S.D.N.Y. July 27, 2005).  A minority of courts in this Circuit has

disagreed, finding that the 2005 Policy is invalid.  *Pimentel v. Gonzales,* 367 F.Supp.2d

365 (E.D.N.Y. 2005) (invalidating regulations); *Drew v. Menifee,* No. 04 Civ. 9944

(HBP), 2005 WL 525449 (S.D.N.Y. March 4, 2005) (same).  The Second Circuit has not

ruled on the issue.

       Having considered these cases, as well as the submissions and arguments of the

parties, the Court is of the opinion that the 2005 Policy is valid, primarily because, under

*Lopez v Davis*, 531 U.S. 230 (2001), it is clear that the BOP has the authority to

categorically exercise its discretion to limit CCC placements to the final ten percent of

their sentences.  Briefly, in *Lopez*, the issue was whether the BOP could categorically

exercise its discretion pursuant to 18 U.S.C. § 3621(e) to deny inmates early release.  In

upholding the BOP's policy, "[t]he Court reasoned that 'even if a statutory scheme

requires individualized determinations . . . the decisionmaker has the authority to rely on

rulemaking to resolve certain issues of general applicability unless Congress clearly

expresses an intent to withhold that authority.'"  *Wiesel*, 2005 WL at \*5 (*citations

omitted*).  Having found no such intent, the Court found that the BOP could rely on

rulemaking – the rule being that early release would never be granted – in exercising its

discretion under § 3621(e).

       There is simply no reason to distinguish the BOP's exercise of discretion in this

case.  Thus, as in *Lopez*, the 2005 Policy should be upheld if "1) it does not reflect an

unreasonable interpretation of Section 3621(b); and (2) Congress did not "clearly

express[] an intent to withhold [the BOP]s] authority" to regulate its discretion under

Section 3621(b) through adoption of categorical rules." *Moss*, 2005 WL 1593016, at * 6

(citing *Lopez*, 531 U.S., at 244). For substantially the reasons set forth in *Moss*, 2005 WL

1593016, at *6-*8, the Court concludes that the 2005 Policy satisfies both conditions, and

should therefore be upheld unless in doing so petitioner's due process rights are violated,

or the *Ex Post Facto* Clause of the Constitution is violated.

### C.     Petitioner's Due Process Claim

Petitioner contends that his due process rights have been violated by the BOP's

application of the 2005 Policy to his CCC placement date. The Court disagrees.

Although the 2005 Policy certainly *disfavors* petitioner in terms of CCC placement dates,

that alone does not – and indeed, cannot – give rise to a due process violation because no

protected interest has been infringed upon. In this respect, *Meachum v. Fano*, 427 U.S.

215 (1976) is directly on point. In *Meachum*, state prisoners alleged that they were

deprived of liberty without due process when they were transferred to a less favorable

penal institution. The Supreme Court disagreed, holding that "the Due Process Clause in

and of itself [does not] protect a duly convicted prisoner against transfer from one

institution to another within the state prison system." 427 U.S., at 225. As the Court

explained:

> The Constitution does not require that the State have more than one prison
> for convicted felons; nor does it guarantee that the convicted prisoner will
> be placed in any particular prison, if, as is likely, the State has more than
> one correctional institution. The initial decision to assign the convict to a
> particular institution is not subject to audit under the Due Process Clause,
> although the degree of confinement in one prison may be quite different
> from that in another. The conviction has sufficiently extinguished the
> defendant's liberty interest to empower the State to confine him in *any* of
> its prisons.
>
> . . .

> Transfers between institutions, for example, are made for a variety of reasons and often involve no more than informed predictions as to what would be best serve institutional security or the safety and welfare of the inmate. Yet under the approach urged here, any transfer, for whatever reason, would require a hearing as long as it could be said that the transfer would place the prisoner in substantially more burdensome conditions that he had been experiencing. We are unwilling to go so far.

*Id.*, at 224-25. The Court concluded by noting that "[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." For the same reason, petitioner's due process claim in this case must fail.

### D.     Petitioner's *Ex Post Facto* Claim

Finally, petitioner alleges that in setting his CCC placement date pursuant to the 2005 Policy, the BOP engaged in "impermissible retroactivity" because he pled guilty and was sentenced before that policy took effect. (Memo. of Law., p. 2). The Court will construe this as a claim that his placement date was set in violation of the *Ex Post Facto* Clause of the Constitution. For several reasons, however, that allegation lacks merit.

The *Ex Post Facto* Clause simply states, "No… ex post facto Law shall be passed" U.S. Const., art. I, § 9, cl. 3; it is well established that the "clause prohibits laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *Lee v. Governor of State of N.Y*, 87 F.3d 55, 59 (2d Cir. 1996) (citing *Collins v. Youngblood,* 497 U.S. 37, 43 (1990)). Petitioner's *ex post facto* allegation amounts to a claim that the 2005 Policy has the effect of "increase[ing] the punishment for [his] criminal acts", ostensibly because his CCC placement date has been delayed. This claim fails to establish the second of "[two critical elements" that "must be present for a

11

criminal or penal law to be *ex post facto*", namely, that the penal law must "disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, *29, (1981).

Whether a "disadvantage" amounts to a violation of the *Ex Post Facto* Clause is a question of degree. *California Dept. of Corrections v. Morales*, 514 U.S. 499, 509 (1995) (*citing Beazell v. Ohio,* 269 U.S. 167, 171, (1925)). Indeed, it is clear that not every material change in position can rise to the level of a constitutional violation. Although there is no litmus test, the inquiry should be governed by the purpose of the Clause. *Morales*, at 504. In this case, application of the 2005 Policy clearly effects no change in the definition of petitioner's crime. The only question, then, is whether by delaying petitioner's CCC placement date, the BOP "increase[d] the punishment" for his crime.

On this question, the Court adopts the reasoning set forth in *Levine v. Menifee,* 05 Civ.1902 (RCC), 2005 WL 1384021, at *6-*10 (S.D.N.Y. June 9, 2005), and concludes that the delay did not effect an increase in punishment. The Court also concurs with *Levine* that the Second Circuit's decision in *Lee*, 87 F.3d 55, is controlling. In *Lee*, inmate plaintiffs were initially eligible for a temporary release program, but, due to an amendment to the New York correctional law, became ineligible, and alleged that this loss of opportunity amounted to an *Ex Post Facto* violation. The Second Circuit disagreed, holding that the loss "does not constitute an increase in punishment", and therefore fails to amount to a constitutional violation. *Id.*, at 59. Rather, according to the *Lee* court, the entirely permissible purpose of the change was to "serve the regulatory purpose of limiting early community contact for those in the designated felony

categories." *Id.* at 59. Perhaps even more so than in *Lee*, the same is true in this case,

which means that the 2005 Policy "falls on the lawful side of the ex post facto line." *Id.*

## Conclusion

For the foregoing reasons, it is hereby ordered that the petition of Milton

Bialostok for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 is denied. The Clerk

of the Court is directed to close this case.


SO ORDERED.

Dated: New York, New York
      August 12, 2005

                                    Richard J. Holwell
                              United States District Judge